NATHANIEL ADAMS,                  )
                                  )
       Plaintiff,               )
                                  )
v.                                )    CV 108-038
                                  )
BONNIE BASILE, Deputy, et al.,    )
                                  )
       Defendants.              )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

*Pro se* Plaintiff, proceeding *in forma pauperis*, was incarcerated at Dodge State

Prison, in Chester, Georgia, at the time he commenced the above-styled case pursuant to 42

U.S.C. § 1983. Plaintiff has since been released from incarceration. The matter is now

before the Court on Defendant Bonnie Basile's motion for summary judgment (doc. no. 25)

and Defendant Caroline Lee's motion for summary judgment (doc. no. 33). Because Plaintiff

has not filed any response to either motion, the Court deems the motions for summary

judgment unopposed.[1] See Loc. R. 7.5. For the following reasons, the Court **REPORTS**

---

[1] The Clerk has given Plaintiff notice of Defendants' motions for summary judgment, has apprised him of his right to file affidavits or other materials in opposition, and has informed him of the consequences of failing to respond. (Doc. nos. 32, 35). Moreover, after noting that Plaintiff had not responded, the Court entered an order instructing him about the effect of failing to respond and giving him additional time to prepare a response. (Doc. no. 36). Accordingly, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) *(per curiam)*, are satisfied. Of course, the Court acknowledges that the mere fact that the instant motions are unopposed does not entitle the Court to grant the motions without considering the merits. United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Florida, 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed,

and **RECOMMENDS** that Defendants' motions for summary judgment be **GRANTED** and that an appropriate final judgment be **ENTERED** in favor of Defendants.

I.     **STATEMENT OF FACTS**

After screening Plaintiff's amended complaint in compliance with 28 U.S.C. § 1915(e)(2)(B)(i) & (ii), the Court allowed Plaintiff's claim of excessive force against Defendant Bonnie Basile, a deputy with the Richmond County Sheriff's Department ("RCSD"), and Plaintiff's claim concerning his medical treatment against Defendant Caroline Lee, a nurse at the Richmond County Jail, to proceed. (Doc. no. 16). In his amended complaint, Plaintiff alleged that on October 21, 2006, Defendant Basile "stopped" Plaintiff and gave him a sobriety test that he purportedly failed. (Doc. no. 5, p. 5). Plaintiff alleged that upon determining that he had failed the sobriety test, Defendant Basile attempted to arrest him, and in the process grabbed his arm. (Id. at 5). Plaintiff maintained that he snatched his arm away, asked Defendant Basile why she was arresting him, and stated, "[I]ts not right." (Id.).

Next, Plaintiff alleges that Defendant Basile tripped him and sprayed him with pepper spray. (Id.). Plaintiff states that he then "jumped up and got into his car, ran off the road, and crashed into a pole." (Id.). According to Plaintiff, other officers joined Defendant Basile, pulled him out of his car, handcuffed him behind his back, and used excessive force, including punching and kicking him in his face and eyes. (Id.).

Additionally, upon his booking into the Jail, Plaintiff states that Defendant Lee and her medical staff failed to take him to an eye specialist in time to prevent permanent damage

but, rather, must consider the merits of the motion.").

2

to his eye. (Id.). As relief, he seeks punitive damages, court costs, damages for pain and suffering, mental distress, as well as compensation for his medical bills. (Id. at 6).

On the other hand, Defendants provided a more detailed account of events leading up to and following Plaintiff's arrest. (Doc. nos. 26, 33). Defendants provided that on October 21, 2006, at approximately 1:20 a.m., Defendant Basile observed a car traveling down the wrong side of the road. (Doc. no. 25, p. 1; doc. no. 27, Basile Aff. p. 1). She pulled behind the car and turned on her emergency equipment to effectuate a traffic stop. (Doc. no. 25, p. 1; Basile Aff. p. 1). The driver of the vehicle moved his car to the side of the road; however, Defendant Basile instructed the driver to proceed to the next right, turn down the street, and then pull over. (Doc. no. 25, pp. 1-2; Basile Aff. p. 2). At first, the driver of the car did not comply with the instruction, and Defendant had to repeat the instruction. (Doc. no. 25, p. 2; Basile Aff. p. 2). When the driver of the vehicle moved the car according to Defendant Basile's instructions, she exited her patrol car and approached the vehicle. (Doc. no. 25, p. 2; Basile Aff. p. 2). Plaintiff was driving the vehicle, and he informed Defendant Basile that he did not have a driver's license because it had been suspended. (Doc. no. 25, p. 2; Basile Aff. p. 3). Defendant Basile informed Plaintiff why she stopped him, and asked Plaintiff if he had been drinking. (Doc. no. 25, p. 2; Basile Aff. p. 2). He responded that he had consumed a "couple of beers" and stated that the car he was driving belonged to his mother. (Doc. no. 25, p. 2; Basile Aff. p. 2). Defendant Basile, after obtaining some information from Plaintiff, requested that he exit the vehicle. (Doc. no. 25, p. 2; Basile Aff. p. 2).

When Plaintiff exited the vehicle, Defendant Basile placed Plaintiff in front of her

3

patrol car so that her video recording equipment in her patrol car could record the events. (Doc. no. 25, p. 2; Basile Aff. p. 2). Defendant Basile then performed various field sobriety tests on Plaintiff. (Doc. no. 25, p. 2; Basile Aff. p. 2). Each test performed on Plaintiff indicated that Plaintiff was in a condition unsafe to drive, or Plaintiff himself indicated that he was unable to perform the test. (Doc. no. 25, p. 2; Basile Aff. p. 2). Additionally, Plaintiff had a strong odor of alcohol, seemed confused, and continually wanted to argue about the reason Defendant Basile stopped him. (Doc. no. 25, p. 2; Basile Aff. p. 2). Defendant Basile made the decision to place Plaintiff under arrest for suspicion of DUI and suspicion of driving with a suspended license. (Doc. no. 25, p. 2; Basile Aff. pp. 2-3).

Defendant Basile asked Plaintiff to turn toward the hood of her patrol car and place both hands on the hood. (Doc. no. 25, p. 2; Basile Aff. p. 3). Plaintiff complied with this directive. (Doc. no. 25, p. 2; Basile Aff. p. 3). Next, Defendant Basile took Plaintiff's right hand, placed it behind his back, and attempted to place handcuffs on him. (Doc. no. 25, pp. 2-3; Basile Aff. p. 3). However, Plaintiff resisted Defendant Basile's efforts to handcuff him, and in fact, he pulled away from her. (Doc. no. 25, p. 3; Basile Aff. p. 3). Defendant Basile continued to hold Plaintiff's arm, and Plaintiff continued to attempte to pull away from Defendant Basile back toward the vehicle he had been driving. (Doc. no. 25, p. 3; Basile Aff. p. 3). Defendant Basile instructed Plaintiff to stop resisting, but he would not do so. (Doc. no. 25, p. 3; Basile Aff. p. 3). Defendant Basile then radioed for backup while she continued to try to prevent Defendant from pulling away from her and getting into his vehicle. Defendant Basile then used her legs to trip Defendant and took him to the ground. (Doc. no. 25, p. 3; Basile Aff. p. 3).

4

Once on the ground, Plaintiff continued to struggle with Defendant Basile. As such, Defendant Basile then sprayed Plaintiff with her OC spray. (Doc. no. 25, p. 3; Basile Aff. p. 3). Because Plaintiff and Defendant Basile were in close proximity, she was also affected by the spray. (Doc. no. 25, p. 3; Basile Aff. p. 3). This allowed Plaintiff to break away from Defendant Basile and flee to his vehicle. Defendant Basile gave chase on foot and was able to reach Plaintiff's vehicle before he drove away. (Doc. no. 25, p. 3; Basile Aff. p. 3). Defendant Basile reached through the driver's side window in an attempt to remove the keys from the ignition, but Plaintiff put the car in reverse and backed up, knocking Defendant Basile away from the vehicle. Plaintiff then put his vehicle in drive and fled. (Doc. no. 25, p. 3; Basile Aff. p. 3).

Plaintiff fled down the street in his vehicle to an intersection where he ran the stop sign, and turned left. (Doc. no. 25, p. 3; Basile Aff. p. 3). He continued down the street where he ran at least two more stop signs, and operated his vehicle at a high rate of speed. (Doc. no. 25, p. 3; Basile Aff. p. 3). Because Plaintiff was driving at a high rate of speed, he pulled away from Defendant Basile, who was pursuing Plaintiff in her vehicle. (Doc. no. 25, p. 3; Basile Aff. p. 3). During the pursuit, Defendant Basile kept the RCSD dispatch notified of her location. (Doc. no. 25, p. 3; Basile Aff. p. 3).

As Plaintiff attempted to negotiate a curve, he lost control of his vehicle and ran off the road. (Doc. no. 25, p. 3; Basile Aff. p. 4). His vehicle struck a telephone pole and a tree and continued traveling through a yard; it then struck a small fence and finally came to a stop after striking another telephone pole. (Doc. no. 25, p. 3; Basile Aff. p. 4). There was extreme damage to Plaintiff's vehicle. (Doc. no. 25, p. 3; Basile Aff. p. 4).

When Defendant Basile arrived at the scene, Plaintiff's horn was blaring loudly. (Doc. no. 25, p. 3; Basile Aff. p. 4). Additionally, Defendant Basile noted that Plaintiff was not wearing a seatbelt, but that his airbags had deployed.[2] (Doc. no. 25, p. 3; Basile Aff. p. 4). Defendant Basile attempted to gain entry into the vehicle, but all doors were locked. She then attempted to reach through the driver's side window, which was partially open. However, she could not reach the lock or the door handle because Plaintiff was grabbing her hands to prevent her from gaining entry. (Doc. no. 25, pp. 3-4; Basile Aff. p. 4). Defendant Basile continually instructed Plaintiff to unlock the doors and exit the vehicle. (Doc. no. 25, p. 4; Basile Aff. pp. 4-5). At that point, Defendant Basile's backup began arriving. (Doc. no. 25, p. 4; Basile Aff. p. 5; doc. no. 30, Niehus Aff. p. 1).

Corporal Michael C. Niehus ("Niehus") of the RCSD was the first backup officer to arrive at the scene. (Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2). He broke the driver's side window with his baton and attempted to gain entry into the vehicle. (Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2). However, after breaking the window, he still could not open the door, presumably, due to the damage to the door from the collision. (Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2). As such, Niehus went around to the passenger side where Defendant Basile had just broken the window with her baton. (Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2). Once the window was open, the officers were able to open the door. (Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2). Plaintiff continued to struggle with the officers and resist their efforts to have him exit the vehicle.

---

[2]Although the airbags deployed, because Plaintiff struck multiple structures (telephone pole, fence, tree, and another telephone pole), it is unclear at what point the airbags actually deployed.

(Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2). As such, Plaintiff had to forcibly be removed from his vehicle. Defendant Basile grabbed Plaintiff's arm and attempted to pull him out of the vehicle through the passenger's door, but he was too heavy. (Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2). Therefore, Niehus assisted her, and together they forcibly removed Plaintiff from the car. In the process, Niehus accidentally ripped Plaintiff's shirt. (Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2).

Once Plaintiff was removed from the vehicle, he continued to resist the officers' effort to place him under control and handcuff him. (Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2). With the assistance of additional officers,[3] Plaintiff was forcibly put on the ground face down and forcibly handcuffed behind his back; he was then placed in a patrol car for transport to the hospital for medical treatment. (Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2).

Plaintiff sustained a head injury and was bleeding prior to being pulled out of the car. (Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2). Defendant Basile asserted that she used the amount of force necessary to remove Plaintiff from his vehicle and then place him under arrest. (Basile Aff. pp. 5-6). Neither Defendant Basile, nor any other assisting

---

[3]Investigator James Swint with the RCSD stated that when he arrived on the scene:

Several other officers were already on the scene . . . [He] immediately ran from his patrol car to the passenger side of [Plaintiff's] vehicle where other officers, including [Defendant] Basile and [] Niehus, had already removed [Plaintiff] from the vehicle. [He] held [Plaintiff's] legs momentarily until [Plaintiff] was completely under control.

(Doc. no. 29, Swint Aff. pp. 1-2).

officers, struck or kicked Plaintiff at any time.[4]  (Doc. no. 25, p. 4; Basile Aff. p. 5; Niehus Aff. p. 2; doc. no. 27).

Following Plaintiff's arrest, he was transported to the Medical College of Georgia ("MCG") Emergency Room ("ER").  (Doc. no. 33, p. 8).  He was discharged the same day (October 21, 2006) with instructions to return to the MCG Ophthalmology Clinic. (Doc. no. 33, p. 8, Ex. C; doc. no. 34, pp. 52-53).  More specifically, he was instructed to call the Clinic within a week if he did not hear from the Clinic within three (3) to four (4) days. (Doc. no. 33, p. 8; doc. no. 34, pp. 52-53).  Plaintiff was then transported to the Richmond County Jail. (Doc. no. 33, p. 8; doc. no. 34, pp. 24-25). Upon intake at the Jail, a nurse conducted an Intake Health Screening, took Plaintiff's vital signs, and reviewed the discharge instructions. (Doc. no. 33, p. 8).  Additionally, Myra Pope, M.D., was contacted to conduct an evaluation, as is customary when an inmate arrives from the emergency room. (Doc. no. 33, p. 9 and Lee Aff. ¶ 9).

On October 25, 2006, Plaintiff was examined by Dr. Pope. (Doc. no. 33, p. 9 and Lee Aff. ¶ 10).  She prescribed Motrin and Percogesic and requested a follow-up consultation with an ophthalmologist at the MCG, per the ER discharge instructions.  (Doc. no. 33, p. 9

---

[4]Once Plaintiff was placed under arrest, a routine search and inventory incident to the impoundment of his vehicle revealed the presence of a .25 caliber handgun loaded with eight bullets in the glove compartment. (Basile Aff. p. 4). Plaintiff was charged with DUI, felony obstruction of a law enforcement officer, driving on the wrong side of the road, driving while license suspended, reckless driving, fleeing and attempting to elude a police officer, and possession of a firearm by a convicted felon. (Id. at 4-5). Plaintiff pled guilty and was convicted of misdemeanor obstruction of a law enforcement officer, driving on the wrong side of the road, driving under the influence of alcohol, driving while license suspended, reckless driving, fleeing and attempting to allude a police officer, and possession of a firearm by a convicted felon. (Doc. no. 31).

and Lee Aff. ¶ 9). Dr. Pope also requested the complete ER records related to Plaintiff's initial treatment. (Doc. no. 33, p. 9 and Lee Aff. ¶ 10). Following Dr. Pope's examination, Defendant Lee continuously tried to schedule an appointment for Plaintiff at the MCG Ophthalmology Clinic. (Doc. no. 33, p. 9 and Lee Aff. ¶ 11). After a few days, Defendant Lee determined that the MCG clinic would not accommodate Plaintiff, and she immediately scheduled Plaintiff for a consultation with Sumner Fishbein, M.D., an ophthalmologist. (Doc. no. 33, p. 9 and Lee Aff. ¶ 11).

On November 2, 2006, Plaintiff was treated by Dr. Fishbein, who recommended Plaintiff have a consult with an Ear Nose and Throat ("ENT") specialist or oral surgeon. Defendant Lee immediately made an appointment with John Douglas Harmon, M.D., an ENT. (Doc. no. 33, pp. 9-10 and Lee Aff. ¶ 12). Also on November 2, 2006, Plaintiff was again examined by Dr. Pope, who requested a consult for an Open Reduction Internal Fixation procedure. (Doc. no. 33, p. 10 and Lee Aff. ¶ 13). On November 3, 2006, Plaintiff was examined by Dr. Harmon, who recommended immediate surgery. (Doc. no. 33, p. 10 and Lee Aff. ¶ 14). Plaintiff was scheduled for surgery at University Hospital, and the procedure was performed by Robert Deal, M.D., (a partner of Dr. Harmon) also an ENT. (Doc. no. 33, p. 10 and Lee Aff. ¶ 14). Following his surgery on November 6, 2006, Plaintiff remained under the care and treatment of Dr. Deal and Dr. Pope, until Plaintiff was transferred to Coastal State Prison on September 4, 2007. (Doc. no. 33, p. 10 and Lee Aff. ¶ 15).

Plaintiff was seen by Dr. Deal on June 8, 2007 for a follow-up appointment; at this appointment Dr. Deal noted the incision was well-healed and the conjunctiva normal. (Doc.

no. 33, pp. 10-11 and Lee Aff. ¶ 15). Dr. Deal then recommended a follow-up appointment with an ophthalmologist in the near future, and a follow-up with Dr. Deal within six (6) months. (Doc. no. 33, p. 11 and Lee Aff. ¶ 16). Plaintiff was seen by Dr. Rogers, who also examined Plaintiff on June 8, 2007. (Doc. no. 33, p. 11 and Lee Aff. ¶ 16). He noted Plaintiff did not require any more outside follow-up appointments, but recommended a follow-up appointment in 6 months if Plaintiff was still incarcerated at the Jail. (Doc. no. 33, p. 11 and Lee Aff. ¶ 16). Plaintiff was transferred to Coastal State Prison before his next follow-up appointment was to be scheduled.

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Applicable substantive law identifies which facts are material in a given case.[5] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on

---

[5]The Court is mindful that for purposes of summary judgment, only disputes about material facts are important. That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929 F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot meet its burden at trial is not sufficient. Clark, 929 F.2d at 608. Evidence presented by the movant is viewed in the light most favorable to the non-moving party. Adickes, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59). A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

11

**B.     Excessive Force**

In his amended complaint, Plaintiff asserted that Defendant Basile used excessive force in effectuating Plaintiff's arrest. "In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's 'objective reasonableness' standard." Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008) (citing Brosseau v. Haugen, 543 U.S. 194, 197 (2004)). "A genuine 'excessive force' claim relates to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest." Id. (citing Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1332 (11th Cir. 2006).

"The Fourth Amendment provides the right to be 'free from the use of excessive force in the course of an investigatory stop or other 'seizure' of the person.'" Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (citation omitted). Although the right to make an arrest or investigatory stop carries with it the right to use some degree of force, "all claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." Graham v. Connor, 490 U.S. 386, 395-96 (1989). The analysis of an allegation of use of excessive force requires the Court to determine whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. The "reasonableness" of the force utilized "turns on the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Davis v.

Williams, 451 F.3d 759, 767 (11th Cir. 2006) (internal quotations and citations omitted).

Here, there is no dispute that Defendant Basile, in an attempt to effectuate Plaintiff's arrest had to used her legs to trip Defendant and take him to the ground, then spray him with her OC spray, and forcibly remove Plaintiff from the vehicle he was driving.[6] Therefore, the Court must determine whether this use of force was objectively reasonable. In this regard, Plaintiff's own account of the events that occurred during his arrest show that he attempted, and did in fact, flee from Defendant Basile. Plaintiff stated that when Defendant Basile attempted to handcuff Plaintiff, he resisted; she then tripped Plaintiff, and while he was on the ground she sprayed him with OC spray. At that point Plaintiff was able to get away from Defendant Basile, and "jumped up and got into his car . . . ." (Doc. no. 5, p. 5).

Additionally, the facts leading up to Plaintiff's arrest provided by Defendants establish that: (1) Defendant Basile observed Plaintiff driving down the wrong side of the road, (2) she had to repeat directions before he complied with them, (3) Plaintiff informed Defendant Basile that his license had been suspended, (4) when Defendant Basile performed sobriety tests on Plaintiff, they indicated he was in a condition unsafe to drive, or he indicated that he was unable to perform the test, and (5) Defendant had a strong odor of alcohol, seemed confused, and continually wanted to argue about the reason Defendant Basile pulled him over. (Doc. no. 25, pp. 1-2; Basile Aff. pp. 1-2). At that point Defendant Basile decided to arrest Plaintiff. (Doc. no. 25, pp. 1-2; Basile Aff. pp. 2-3).

When Defendant Basile attempted to handcuff Plaintiff, he yanked his arm away from

---

[6]Although Plaintiff claimed in his amended complaint that Defendant kicked and punched him, there is nothing in the record to substantiate such a claim. (See Basile Aff. p. 4; doc. no. 29, p. 2; doc. no. 30, p. 2).

her and attempted to pull away from her toward the vehicle he was driving. (Doc. no. 25, p. 2; Basile Aff. pp. 1-2). Despite Defendant Basile's instructions to stop resisting, Plaintiff continued to resist. (Doc. no. 25, pp. 2-3; Basile Aff. p. 3). As such, Defendant Basile, using her legs, tripped Plaintiff and took him to the ground; he continued to resist and attempt to pull away from Defendant Basile. (Doc. no. 25, p. 3; Basile Aff. p. 3). Accordingly, Defendant Basile sprayed Plaintiff with OC spray. (Doc. no. 25, p. 3; Basile Aff. p. 3). At that point, because Defendant Basile was also affected by the spray, Plaintiff was able to free himself from Defendant Basile, and return to the vehicle he was driving. (Doc. no. 25, p. 3; Basile Aff. p. 3). Therefore, Defendant Basile ran to Plaintiff's vehicle, attempted to open his door. (Doc. no. 25, p. 3; Basile Aff. p. 3). Plaintiff put the car in reverse and backed up, knocking Defendant Basile away from the vehicle. (Doc. no. 25, p. 3; Basile Aff. p. 3).

Then, Plaintiff proceeded to drive the vehicle at a high rate of speed, ran stop signs, and was able to pull away from Defendant Basile, who was in pursuit of Plaintiff in her own car. (Doc. no. 25, p. 3; Basile Aff. p. 3). Plaintiff then lost control of his vehicle while attempting to navigate a curve, ran off the road and struck a fence, a tree, and two telephone poles before coming to a stop. (Doc. no. 25, p. 3; Basile Aff. p. 4). When Defendant Basile arrived at the scene she: (1) attempted to gain entry into Plaintiff's car[7]; (2) continually instructed Plaintiff to unlock the doors, but he refused; (3) reached in through Plaintiff's open window to attempt to unlock the door, but Plaintiff grabbed her hands to prevent her

---

[7]Notably, Plaintiff was not wearing a seatbelt when Defendant Basile arrived at the scene of the crash.

from gaining entry; (4) broke the passenger-side window to open the door due to Plaintiff's failure to cooperate; and (5) with the assistance of other officers had to forcibly remove Plaintiff from the vehicle. (Doc. no. 25, pp. 3-4; Basile Aff. p. 4). Finally, once out of the vehicle Plaintiff still continued to resist arrest. Thus, it was reasonable, in light of the facts and circumstances confronting Defendant Basile for her to use the force that she did to effectuate Plaintiff's arrest.

Defendant Basile had probable cause to believe that Plaintiff was driving under the influence on a suspended license, and she could reasonably perceive that Plaintiff posed an imminent threat to Defendant and other bystanders, and noted that Plaintiff ignored Defendant's repeated commands to stop resisting. Defendant Basile's decision to forcibly remove Plaintiff from the car under these circumstances was objectively reasonable. McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1246 (11th Cir. 2003) (citing Graham, 490 U.S. at 396 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.")). Therefore, Plaintiff's Fourth Amendment claim based on the alleged use of excessive force for his arrest is without merit, and Defendant Basile is entitled to summary judgment.

### C.    Deliberate Indifference to his Health

Plaintiff also claimed that Defendant Lee was deliberately indifferent to his serious medical needs because, while he was incarcerated at the Jail following his arrest, Defendant Lee and her medical staff failed to take him to an eye specialist in time to prevent permanent

damage to his eye. Defendant Lee, on the other hand, contends that there is no evidence that she was deliberately indifferent to Plaintiff's medical needs, nor is there any medical evidence that Plaintiff sustained any injury as a result of an alleged delay in medical treatment. (See generally doc. no. 33).

Bearing the standard for a motion for summary judgment in mind, Defendant Lee's motion for summary judgment should be granted.[8] To survive Defendant Lee's motion for summary judgment, Plaintiff must produce evidence from which a reasonable jury could conclude: (1) that Plaintiff had an objectively serious medical need, (2) that Defendant Lee acted with deliberate indifference to that need, and (3) that Plaintiff's injury was caused by Defendant Lee's wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007) (citations omitted). Although Plaintiff's eye injury constitutes a serious medical need, Plaintiff has not shown that Defendant Lee acted with deliberate indifference to his serious medical needs.

To show that Defendant Lee was deliberately indifferent to his needs, Plaintiff must

---

[8]A claim that a pretrial detainee has been denied adequate medical care is properly addressable under the Due Process Clause of the Fourteenth Amendment. Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979). The Eleventh Circuit Court of Appeals has held that "in regard to providing pretrial detainees with basic necessities as food, living space, and medical care the minimum standard allowed by the Due Process Clause is the same as that allowed by the Eighth Amendment for convicted persons." Hamm v. Dekalb County, 774 F.2d 1567, 1574 (11th Cir. 1985). Because the Eleventh Circuit has held that the minimum standard for the provision of basic necessities, including medical care, is the same for convicted prisoners under the Eighth Amendment and for pretrial detainees under the Fourteenth Amendment, it is appropriate to examine Eighth and Fourteenth Amendment decisional law concerning Plaintiff's claim. See Lancaster v. Monroe County, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997) ("Because both Eighth Amendment cases and Fourteenth Amendment cases establish what constitutes 'deliberate indifference,' we will rely upon decisions in both types of cases.").

offer some proof that Defendant Lee: (1) was subjectively aware of a serious risk to Plaintiff's health, and (2) that Defendant Lee disregarded that risk by (3) following a course of action which constituted "more than mere negligence." Id. In addition, the plaintiff seeking to show that a delay in medical treatment amounted to deliberate indifference "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir.1994), *abrogated in part on other grounds by* Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002)); see also Farrow v. West, 320 F.3d 1235, 1244 n.12 (11th Cir. 2003) ("In Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002), the Supreme Court criticized part of the qualified immunity analysis in Hill, but not Hill's analysis of what constitutes a serious medical need of prisoners."). To the extent that Plaintiff avers that Defendant Lee's treatment of his medical complaints was deficient, he has provided the Court with no evidence in support of this conclusory allegation.

Furthermore, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." West, 320 F.3d at 1243 (internal quotation and citation omitted). The Eighth Amendment does not mandate that the medical care provided to the prisoner "be perfect, the best obtainable, or even very good." Harris, 941 F.2d at 1510 (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980) (Bowen, J.)). As the Supreme Court has explained:

> [A]n inadvertent failure to provide medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical

17

> malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Thus, mere allegations of negligence or malpractice do not amount to deliberate indifference. Campbell v. Sikes, 169 F.3d 1353, 1363-72 (11th Cir. 1999) (explaining that medical malpractice cannot form the basis for Eighth Amendment liability); Harris, 941 F.2d at 1505.

Given these facts, nothing in the record supports the conclusion that Defendant Lee subjectively knew about a risk of serious harm to Plaintiff, disregarded that risk, or provided inadequate medical treatment, let alone that she followed a course of action that was "more than gross negligence." Indeed, the record establishes that, after Plaintiff crashed his vehicle, he was taken to, and treated at, the MCG ER, where the ER physician discharged Plaintiff following the examination and determined only a follow-up consultation after a week of recovery was required. He was then booked into the Jail, where he was seen by a nurse. Dr. Pope was notified about Plaintiff, and a consultation with Dr. Pope was scheduled. Pursuant to the discharge instructions – instructing Plaintiff to return to the MCG Ophthalmology Clinic within a week if he did not hear from the clinic within 3 to 4 days – there was no basis for Defendant Lee to suppose any risk of serious harm to Plaintiff, let alone that there was any urgency to schedule a surgery.

Furthermore, to the extent Plaintiff argues that Defendant Lee was deliberately indifferent to his serious medical needs because she delayed scheduling an appointment with the MCG Ophthalmology Clinic, Plaintiff's claim fails. (Doc. no. 15). As noted previously,

"[a]n inmate who complains that [a] delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of [the] delay in medical treatment to succeed." Hill, 40 F.3d at 1188, *abrogated on other grounds by* Hope, 536 U.S. 730 (2002). "Whether [a] delay in treatment was tolerable depends on the nature of the medical need and the reason for the delay." Farrow, 320 F.3d at 1247.

First, that the MCG Ophthalmology Clinic refused to see Plaintiff, notwithstanding the referral from its ER department, cannot be attributed to Defendant Lee. Indeed, within a few days, as soon as it became apparent that MCG Ophthalmology Clinic would not schedule an appointment with Plaintiff, Defendant Lee immediately scheduled Plaintiff for an appointment with Dr. Fishbein.

Second, despite Plaintiff's contention, the record reflects that Plaintiff's medical treatment was not delayed. In fact, the record establishes that from the time Plaintiff arrived at the Jail, Defendant Lee ensured that Plaintiff had prompt, near constant medical attention. Following Plaintiff's arrest, he was transported to the MCG ER Room and discharged the same day (October 21, 2006) with instructions to return to the MCG Ophthalmology Clinic within a week if he did not hear from the clinic within 3 to 4 days. (Doc. no. 33, p. 8). Plaintiff was then transported to the Jail where a nurse, on October 21st, conducted an Intake Health Screening, took Plaintiff's vital signs, and reviewed the discharge instructions. (Id.). Additionally, Dr. Pope was contacted to conduct an evaluation as is customary when an inmate arrives from the emergency room. (Doc. no. 33, p. 9 and Lee Aff. ¶ 9).

19

On October 25, 2006, four days after Plaintiff's arrest, he was examined by Dr. Pope. (Doc. no. 33, p. 9 and Lee Aff. ¶ 10). She, among other things, requested a follow-up consultation with an ophthalmologist at the MCG, per the ER discharge instructions. (Doc. no. 33, p. 9 and Lee Aff. ¶ 9). Following Dr. Pope's examination, Defendant Lee tried to schedule an appointment for Plaintiff at the Medical College of Georgia Ophthalmology Clinic. (Doc. no. 33, p. 9 and Lee Aff. ¶ 11). Once Defendant Lee determined that the MCG clinic would not accommodate Plaintiff, she immediately scheduled Plaintiff for a consultation with Dr. Fishbein, an ophthalmologist, and on November 2, 2006, Plaintiff was treated by Dr. Fishbein who recommended Plaintiff have a consult with an ENT or oral surgeon. Defendant Lee immediately made an appointment for the next day with Dr. Harmon, an ENT. (Doc. no. 33, pp. 9-10 and Lee Aff. ¶¶ 11, 12). On November 3, 2006, Plaintiff was examined by Dr. Harmon, who recommended immediate surgery. (Doc. no. 33, p. 10 and Lee Aff. ¶ 14). Plaintiff was scheduled for surgery at University Hospital, and the procedure was performed by Dr. Deal, (a partner of Dr. Harmon) an ENT on November 6, 2006. (Doc. no. 33, p. 10 and Lee Aff. ¶¶ 14, 15). Plaintiff was seen by Dr. Deal on June 8, 2007 for a follow-up appointment; at this appointment Dr. Deal noted the incision was well-healed and the conjunctiva normal. (Doc. no. 33, pp. 10-11 and Lee Aff. ¶ 15). Dr. Deal then recommended a follow-up appointment with an ophthalmologist in the near future, and a follow-up with Dr. Deal within six (6) months. (Doc. no. 33, p. 11 and Lee Aff. ¶ 16). Plaintiff was seen by Dr. Rogers who also examined Plaintiff on June 8, 2007. (Doc. no. 33, p. 11 and Lee Aff. ¶ 16). He noted Plaintiff did not require any more outside follow-up appointments, but recommended a follow-up appointment in 6 months if Plaintiff was still

20

incarcerated at the Jail. (Doc. no. 33, p. 11 and Lee Aff. ¶ 16). Plaintiff was transferred on September 4, 2007.

Thus, from the time of Plaintiff's accident until he was transferred to Coastal State Prison, he was seen at the MCG ER on October 21, 2006, he was examined by a nurse at his booking into the Jail the same day, he was examined on October 25th by Dr. Pope, he was examined on November 2nd by Dr. Fishbein, he was examined on November 3rd, by Dr. Harmon, and he underwent a surgery on November 6th. Following the surgery, Plaintiff continued to be treated by Drs. Pope and Deal. Thus, while incarcerated at the Jail, Plaintiff was promptly and constantly treated by physicians.

Moreover, Plaintiff's claim for deliberate indifference also fails because the record does not reflect <u>any</u> verifying medical evidence to establish a detrimental effect from any purported delay in medical treatment. Indeed, Plaintiff himself does not allege any detrimental effect. He only, in a conclusory fashion, states in his amended complaint that Defendant Lee failed to get Plaintiff to an eye specialist in time to prevent permanent damage to his eye. (Doc. no. 5, p. 5). The record is simply devoid of any evidence that a delay in treatment could have caused or exacerbated Plaintiff's eye problems.

In sum, Plaintiff has not shown a delay in medical treatment. Even assuming for the sake of argument that there had been a delay in medical treatment, that assertion alone is insufficient to generate a dispute of material fact because Plaintiff has not shown that the purported "delay" in treatment by an eye specialist had a detrimental effect on Plaintiff. Additionally, he has not provided any evidence to indicate that Defendant Lee somehow

21

insufficiently handled Plaintiff's medical care. Furthermore, Plaintiff has not provided the Court with medical evidence to support his conclusions that Defendant Lee was deliberately indifferent to his serious medical needs or that he suffered any detrimental effects as a result of the medical treatment he received while incarcerated at the Jail. Rather, the record demonstrates that, while incarcerated at the Jail, Plaintiff received prompt constant treatment.

## III.    CONCLUSION

For the foregoing reasons, the Court **REPORTS** and **RECOMMENDS** that Defendants' motions for summary judgment (doc. nos. 29, 33) be **GRANTED** and that an appropriate final judgment be **ENTERED** in favor of Defendants.

SO REPORTED and RECOMMENDED this 29th day of October, 2009, at Augusta Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE